MATTIE INGRAHAM, *Appellant*, v. CHARLES INGRAHAM, *Appellee.*

Opinion Filed June 25, 1920.

Where the material testimony adduced in a suit for divorce on statutory grounds is uncontradicted and wholly fails to support the allegations of the bill, the decree of the chancellor granting a divorce will be reversed.

An Appeal from the Circuit Court for Hillsborough County, F. M. Robles, Judge.

Decree reversed.

*Jos. F. Miyares,* for Appellant;

*Harry N. Sandler,* for Appellee.

BROWNE, C. J.—Mattie Ingraham appealed from a decree granting her husband, Charles Ingraham, a divorce on the grounds of adultery.

On May 2, 1919, the complainant filed a bill for divorce against his wife, charging her with violent and ungov-

ernable temper and extreme cruelty. Issue was joined by answer and a special master appointed on the 18th of June to take the testimony. This was done on the 24th of June, 1919. After the completion of the testimony the complainant asked and was granted leave to amend his bill of complaint by adding this paragraph:

"And your orator further charges the said defendant in the City of Tampa and State of Florida, subsequent to the 30th day of August, 1918, in disregard and violation of her marriage duties and obligations, committed adultery with a man and men to your orator unknown, and that the said defendant is guilty of adultery."

On final hearing the chancellor entered his decree granting the divorce on the grounds:

"That the equities of this cause are with the complainant, and that the defendant has committed adultery subsequent to her marriage with the complainant herein, as charged in said amended bill of complaint."

It is not necessary to discuss the first assignment of error as the case must be reversed on other grounds.

There is no reference in the decree to the charges of violent and ungovernable temper and extreme cruelty, the divorce being granted upon the ground of adultery set up in the amendment to the original bill. The only evidence introduced to show the indulgence in violent and ungovernable temper or extreme cruelty covers two incidents which the complainant thus describes: "I asked her for the brush to brush my clothes off with, I asked her first to brush them and she said she would not, and then I asked her for the brush, I was standing over by the wash stand at the time, started to wash up and she threw

the brush at me, and if I hadn't turned just in time it would have hit me. Q. When was the occasion when you stated that she hit you with the towel? A. The following week. Q. That towel you say she hit you with, was it a wet or dry towel? A. It was wet—she snapped it on me like that (indicating) ; the towel had been used and was damp on one end. Q. You charge in your bill of complaint that she had been guilty of habitual indulgence in a violent and ungovernable temper, did she exhibit outbursts of temper frequently? A. She did. Q. What would she do, in what way did she exhibit it? A. She would start up things by cursing me, and using the towel on me and throwing the brush, and one instance she ran out of the house in a one-piece garment, a sleeping garment, she ran a half block in that. Q. Was that in the day time or night time A. At night. Q. What time of night? A. Right after dark."

The complainant's mother and sister testify substantially to the same effect.

This testimony is wholly insufficient to support either charge.

The testimony as to adultery upon which the court granted the divorce, is equally insufficient.

The complainant and defendant were married on August 30, 1918, in Jacksonville, Fla., where defendant resided and went at once to Tampa to reside. After living for a short time on Fortune street, they went to live with the complainant's mother, and stayed there until the defendant returned to Tampa from a trip to Jacksonville.

The entire testimony by the complainant in support of the charge of adultery consists of statements said to

have been made by defendant to the mother of the complainant and to a negro washer-woman.

The complainant's mother testified: "Only she didn't like Tampa and didn't like anything in Tampa; she was going back to Jacksonville if she had to go on the streets to earn money like other girls do. * * * Q. How many times did she tell you that? A. A good many times."

The negro washer-woman testified: "She would come out in the yard and talk to me; she told me that she wanted to go to Jacksonville, and that she was going if she had to go on the streets to get the money to go with. She came out to my house and talked; she said she was expecting some of her old fellows she used to know and go with, some of her old sweethearts, and wanted to know if she could bring them out to my house, and I finally told her that she ought not to come to my house that way, that I was a colored woman and it wasn't right for her to do that. She told me that she was going to Jacksonville just as soon as she could get the money; she said she would get the money if she had to go on the street. She said she was coming to tell me her business, and she said she was going to bring her fellows over when they got here from Jacksonville."

It is admitted by the complainant and defendant that in December, 1918, she went to Jacksonville. That the husband bought her railroad ticket. She remained away three months lacking a few days. She testified that she wrote to her husband every day for two months, but never heard from him. He only sent her money on one occasion; $3.00 in obedience to an order of court after she had caused a warrant to be issued against him charging him with desertion. When she returned to Tampa in

March she was pregnant—expected to give birth to a child in August. She went directly to the house of her husband's mother with whom she had been living before she went to Jacksonville, and was refused admission by his mother. She then went back to the station, and was advised by the matron to go to the Salvation Army home. They gave her a room for a week until she could get work. From there she took a room on Fortune street, and stayed a week until she was asked to give it up because the woman needed it for a party who wanted to do light housekeeping. She then got a room on Franklin street; went there at seven o'clock at night. With regard to this, she testified: "Q. How long did you stay there? A. One night. Q. What happened the night you were there? A. The house was raided. Q. Were you arrested in that raid? A. No sir. Q. Were you taken to the police station? A. No sir. Q. Were you taken from the house at all? A. No, sir. Q. You left Tampa again after that? A. Yes, sir. Q. Where did you get the money that time? A. Detective Thomas gave me the money. Q. Where did you go then? A. Went to Georgia, to my aunt. Q. How much money did Mr. Thomas give you? A. Ticket to Georgia. Q. Did he go to the station with you? A. No, sir. Q. Went by yourself? A. Yes, I did."

Not a word of testimony was offered to show that the defendant ever was in company with any man at any time or in any place, except her husband and the detective who gave her a ticket to go home with.

If we place the worst possible construction on her statement that "she was going back to Jacksonville if she had to go on the streets to earn money like other girls do," it amounts only to a statement of what she might do, and was not an admission of guilt.

The same is true of the statement testified to by the negro washer-woman, that she was "expecting some of her old fellows she used to know and go with, some of her old sweethearts, and wanted to know if she could bring them out to her house." Not a word of testimony that she ever went there with any man, or ever attempted to do so.

If the expression "some of her old fellows she used to know and go with," is to be taken as meaning men with whom she had had sexual intercourse, it did not prove the charge of adultery committed "subsequent to the 30th day of August, 1918," because the complainant and defendant were married on that day, and moved at once from Jacksonville, and from the negro woman's testimony the men she was expecting were to come from Jacksonville. There is no warrant in the testimony for the conclusion that this girl had been guilty of immorality, but if there were, it would relate to acts committed before and not subsequent to their marriage on August 30th.

The testimony describing the specific acts of alleged cruelty and violent and ungovernable temper, is not contradicted, but taken as true, it falls far short of establishing either charge.

We have discussed her statements about what she would do if she had to in order to raise money to go back to Jacksonville, and about taking her friends to the negro woman's house, and it only remains to consider the defendant's testimony in relation to the raiding of the house where she had taken a room. Stript of verbiage, it is this—she took a room in this house at seven p. m. and it was raided at midnight. She was not arrested, not interfered with, and spent the rest of the night in the house.

Whether the house was raided as a gambling house, or a place where violations of the prohibition law were supposed to take place, or as a meeting place of anarchists, or a resort of other immoral persons, does not appear from the testimony. Even if it had been established that the house was raided because it was supposed to be a sexually immoral house, no attempt was made to prove that this girl under twenty-one years of age— within five months of giving birth to a child, went there for an immoral purpose or knew the character of the house, if it was an immoral place.

There being no testimony upon which a divorce could be granted, on any of the grounds set up in the bill and the amendment, the decree is reversed.

TAYLOR, WHITFIELD, ELLIS AND WEST, J. J., concur.